Please the court. My name is Rachel Game and I'm the attorney for petitioner Jeronimo David Siquina-Chox. In August of 1993, when Mr. Siquina was 17 years old, he fled his native Guatemala and came to the U.S. seeking asylum because his life had been threatened by the Guatemalan army on account of an imputed political opinion of his father. Six months later, while he was still a minor, Mr. Siquina filed an independent asylum application. The government waited more than 10 years before processing the minor's asylum application. And when Mr. Siquina appeared at his asylum interview and at the merits hearing, he was without the benefit of legal representation. The petitioner has three main arguments today. First, the immigration judge placed too much weight on the asylum officer's assessment to refer. Second, the immigration judge failed to address the petitioner's explanations why there were inconsistencies and omissions in his testimony in a reasoned manner. And third, the immigration judge's reasoning that Mr. Siquina intentionally omitted his more serious criminal conviction is nothing more than speculation and conjecture. The immigration judge placed too much weight on the asylum officer's assessment to refer because it's basically a hearsay document. Mr. Siquina testified at his merits hearing that he had not received the assessment to refer, nor had he read the assessment to refer. And in response to this admission, the immigration judge said that he wouldn't be considering it too much except as the petitioner was going to refer to it. The immigration judge began the hearing by going over the handwritten statement that was in the Mr. Siquina's asylum application. There was nothing wrong with that, right? Pardon me? There was nothing wrong with that. No. That's pretty common. That was a good thing to do in these circumstances. But when Mr. Siquina doesn't tell about forced recruitment, when the immigration judge asked if he had any other concerns, and the immigration judge said, no, I don't have any other concerns,  And that's when the immigration judge starts to confront Mr. Siquina with what was in the assessment to refer. Well, he – I thought what he was doing, he was trying to get him to say, all right, is there anything else? And then he said, now, you've told me about the army coming into search for weapons, and you've told me about the people. Why didn't you mention the guerrillas who threatened you and tried to recruit you? And so he began to explore that. And he said, right, he confronted your client with the inconsistencies, and your client got pretty tangled up in who he was blaming for what. I think the problem with that is that the immigration judge assumes that Mr. Siquina never told the asylum officer about the main crux of his asylum application. Well, no, I think he was also concerned that he didn't mention the guerrillas. You know, he was blaming it all on the army and the townspeople. And he's omitting this major event, which apparently had been the event that was put forward before the asylum officer. Isn't that right? Well, it may have been one of the events that was in the asylum interview, but... He didn't mention it in the testimony to the immigration judge. And so the immigration judge asked him about it. Right. He did not talk about it on his own, but when asked about it, he was forthright and said, yes, that did happen. I may be misrecalling, but he then seemed to be saying it was the guerrillas who were searching for weapons. And our position on that would be that it's not inconceivable that during a civil war with two sides that the guerrillas could have also searched his home. Well, that's true. But in the asylum application, it was recruitment, and it was the army that in his testimony that came in looking for weapons that he was complicit with the guerrillas. I'm just, you know, we're sitting here trying to find a way whether the immigration judge who had your client in front of him was doing proper inquiry. And reading the transcript, I have to say that it gets quite a bit garbled. Yes. The problem with the immigration judge accepting the assessment to refer as complete testimony or the only thing that Mr. Sakina may have mentioned was forced recruitment or finding a variance between whether it was three hours that he was detained or an entire day is that the asylum officer was never called as a witness. There's no record of the interview. I had the impression that, I mean, I think I'm having the same problem that Judge Fisher is. It's not that you put the two statements together and say they're entitled to equal weight. The assessment, I mean, the statement of the asylum officer and the testimony before the IJ, it's when the IJ says, well, here are these earlier statements that were attributed to you when you first came to the United States. Could you explain why this statement says A and this statement says B? And then the way that your client tries to explain the differences is what troubles the IJ. It's not just the fact that there are differences, but it's the whole way in which your client deals with the differences. So it's not saying, well, you have two documents entitled to equal weight that say different things. It's saying, here's an apparent discrepancy. I'm giving the petitioner ample opportunity to explain it, and I don't think he's explaining it. I mean, is that unfair? Well, to that we would respond that the immigration judge failed to consider Mr. Sakina's testimony, why his testimony was lacking, in that it had happened a long time ago and that he was young. Also, he didn't have the benefit of legal representation to tell the story. The immigration judge cites to a 1998 INS memo about children asylum seekers, and he says that he refers to it, though, saying, I'm not comparing adult to children. And it would have been more helpful had he realized that these claims happened, that these past persecution events happened when Mr. Sakina was a child. And as such, there's a passage in the memo that says that asylum officers should bear in mind that an applicant who's above the age of 18 at the time of the asylum interview may recollect the events as a child. And we don't believe that the immigration judge really gave any weight to Mr. Sakina's explanation that it had been more than 10 years in between experiencing the events, and also that he was confused. And the confusion could have resulted from traumatic stress that, you know, the immigration judge doesn't ask where was your mother during this time, where your what precipitated his father's flight, were siblings harmed. This is a school-aged boy that was interrogated and threatened to death by the Army, and from his testimony and the confusion in his testimony, the immigration judge should have considered that it could have been due to the fact that he was a minor when he experienced this. Let me have a little question to ask you about the conviction that was not originally described in the statute. It was for changing the date on a Department of Environmental Quality emissions sticker. And Mr. Sakina explained that when he went to the Department of Motor Vehicles, he had gotten... What was the charge? Was forgery in the second degree, which is uttering a... And the petitioner, when asked whether he had any other arrest besides a DUI, he did admit, yes, I had another arrest, but the immigration judge said, okay, that's fine, and it was on cross-examination by the trial attorney that he said, wasn't it true, you were arrested for forgery. And then the petitioner explained... Did the IJ rely on that forgery conviction to discredit his testimony? I think that he took it in... In the decision, he says he's not relying it, but as if to leave no doubt as to the credibility, then he says that he intentionally omitted the most serious offense. And we would argue that changing an environmental air quality sticker is not necessarily more serious than driving under the influence, and also there's nothing to say that he intentionally omitted it. The petitioner said that it had slipped his mind, and then he was very forthright in explaining the situation when asked by the immigration judge. The petitioner would ask that the court remand this case back to the Board of Immigration Appeals so that it can forward the case to the Attorney General and he can grant asylum in his discretion. Thank you. Thank you. May it please the Court. James Cox appearing on behalf of the United States. Petitioner's application for asylum was denied by the immigration judge on the ground that petitioner's testimony lacked credibility due to inconsistencies in the testimony regarding the sources and the basis of the alleged... Now, how many years was it from the time of the incident to the time of the hearing? From the time of the incident to the time of the hearing was over 10 years, Your Honor, just over 10 years. And how old was this when all this happened to him in Guatemala? He was 17 years old in 1993 when the alleged events occurred, and was then, it was 10 years later when his hearing occurred. And I think it is useful to address the three arguments raised by a petitioner regarding the procedural, the conduct of the hearing. And those three arguments are his juvenile status at the time of the events, the passage of time between the events and the hearing, and then third is his pro se status. At the beginning of the asylum hearing, the immigration judge said, I realize the petitioner is here pro se, so I'm going to review, his asylum application with him, indicating that that's what an attorney would do with him. And so he first walks him through the asylum application, including the fact that the guerrillas, his statement that the guerrillas, he didn't believe in their war, and the petitioner affirmed that statement. And then the IJ asked for more details about the incident with the Army, didn't receive a whole lot of more information, but then asked, well, what other events occurred? And the petitioner initially couldn't come up with any, but the IJ continued to pursue the issue before just instantly saying, well, that's not what you said earlier, just dropping the issue. The petitioner even went on to mention these tensions between the urban and rural communities regarding the political situation in Guatemala. Only then, after the IJ had exhausted what the try to determine other sources of persecution, that's when the IJ actually then, as this Court's precedents have held, raised the inconsistency with the petitioner and said, well, before you've mentioned problems, death threats from the guerrilla forces. And at that time, the petitioner then went and adopted that statement. And the petitioner did not claim that he, that it was the passage of time that, as to why he didn't remember that. He claimed that he wasn't sure what the IJ was asking for. And the IJ said, in his decision, said, well, I don't find that persuasive. But then the IJ then went on to address the secondary issue, which is, okay, you've had death threats from the Guatemalan guerrillas. Now, what was the source or the basis for this persecution from the guerrilla forces? And at that time, that is when the petitioner went into a statement regarding a search for weapons. And then at that point, the IJ again, he, the IJ again tried to get information about the alleged forcible conscription. He said, did the guerrillas request anything of you, request anything else of you? And the petitioner could not mention the forcible conscription. And it's important to note that the IJ had already mentioned the forcible conscription issue when he addressed the source of persecution issue. Now, do we know at the hearing, did he get a chance to see this assessment to refer? Your Honor, we can't establish that from the hearing. We don't know. Do we know if he ever had this document before the hearing? Well, the IJ did enter into evidence, Your Honor, because there was a proof of service with the document. It had been some of the exhibits that the government sent to Petitioner's house. And the IJ at the beginning of the hearing asked the petitioner what he had with him. And what the petitioner brought with him was the items that had been handed to him at the previous hearing three months before when it was established. And one of those documents was this assessment to refer? No, Your Honor. The only documents there were the country conditions, the asylum application, those documents. The assessment to refer was in a separate materials that the immigration service served on Petitioner with a proof of service. The IJ noted that the petitioner lived with other individuals. And so for that reason, maybe he didn't actually receive it. But the IJ said, well, there's proof of service. I'm not going to rely on it. I'm going to we'll refer to it during the hearing. And that's exactly what the IJ did, Your Honor. The IJ, once the petitioner couldn't recall the source of persecution from the guerrillas, at that point he said, well, we've got this statement in the assessment to refer regarding forcible conscription. And the petitioner said, you know, that's correct, too. And then they moved on to talk about the basis for that guerrilla persecution. And that's when the story about the weapon search came out, and the petitioner did not discuss this forcible conscription. And then the IJ moved on and once again confronted or raised this issue with the petitioner to say, you previously said forcible conscription, and yet you didn't mention that here. And that is when the petitioner also adopted that statement and blamed the passage of time for not recalling that, because it had been a while. But it's important to note on that point that that interview with the asylum officer had occurred less than a year before the hearing. It occurred in June of 2004, in which the forcible conscription was mentioned and that petitioner has acknowledged occurred. And so the IJ took into account petitioner's explanation that I was a juvenile, I was pro se, there's been a passage of time, but that didn't explain this inconsistency here, because the forcible conscription was confirmed by the petitioner at the hearing and was recalled at the asylum interview in 2004. And so the passage of time doesn't explain that inconsistency. And after those two issues were raised, at that point the petitioner or the immigration judge noted in his decision that the petitioner did have a conviction for forgery in the acknowledging that conviction. And the IJ's decision, though, is clear that he had already reached the conclusion that the petitioner was not credible before he then moved on to mention this conviction. And this Court's precedence makes clear, Carr v. Gonzalez says that inconsistencies and omissions are considered in light of all the evidence in the case. And so this conviction and the failure to admit the conviction is acceptable as background evidence. It's obviously not central to the asylum claim, but the IJ can consider that as background type evidence. And before the BIA, the petitioner acknowledged that. The petitioner stated that it was used to bolster the adverse credibility determination. So the petitioner acknowledged there that this was not the basis for the adverse credibility decision. He relied on it as background evidence for the whole finding. He did, you know, in his application, he did state that I am asking for political asylum in this country because my life was in danger in my country, Guatemala. I was threatened to death for members of the guerrilla. They consider me enemy because I don't believe in their war. That's correct, Your Honor. That's the first statement in his asylum application. And that's why the immigration judge wanted to elicit that information. And the immigration judge went through that application at the beginning of the hearing with the petitioner. But when asked about that incident that was mentioned in the application, the petitioner was unable to mention the fact of it or the basis of the persecution and the fact that it was not believing in their war, the forcible conscription argument. And this Court's precedents clearly indicate that the source and the basis of alleged persecution is central to an asylum claim. That's the Sabalos-Castillo case in which a Guatemalan was inconsistent regarding whether it was government or guerrilla persecution. And it's worth noting that in Sabalos-Castillo, the IJ had also said that the petitioner's decision to leave their child back in the country was another basis for the adverse credibility determination. And this Court rejected that basis but held that the basis of the source of the persecution was an acceptable finding by the IJ and affirmed on that basis. So even if one were to just assume for the sake of argument that the IJ relied on the basis for the adverse credibility determination, that still would not be sufficient to remand this matter because there's still the independent sufficient ground of the inconsistency regarding the source and basis of the alleged persecution. If there are no more questions, Your Honor, then the government would ask that the petition for review be denied on the ground that the inconsistencies identified by the immigration judge went to the heart of the petitioner's claim and were supported by substantial evidence. Thank you. Thank you. I'll give you a minute for a rebuttal. You don't have to take it. I just, you look like you might want to say something. But if you don't, you don't have to. The only thing I would say about the... Let me ask you. I'm not sure if the application says... I have a question. The application is back in 1994. I'm sorry, I missed it. The application that talks about the guerrillas and the army is in 1994, but there is this June 2004 assessment by the asylum officer. Yes. Now, was that based on a conversation with your client? The assessment to refer? Yes. That was an interview that he went to with the asylum officer. It's the asylum officer's notes. Yes, but basically the asylum officer is adding some information about the detainment by the guerrillas. That's where the they held me for one day comes from, doesn't it? And that's what the IJ is talking about. So it isn't as if the subject of the guerrillas wasn't... Are you saying that the assessment officer didn't really talk to him about the guerrillas? Well, we don't know what the asylum officer asked. We don't know what... It does seem odd to me that in the handwritten statement in the asylum application, the petitioner says the real danger, and he talks about the event that precipitated his flight from Guatemala, but that's nowhere mentioned in the assessment to refer, and I find that odd. And it makes me believe that the asylum officer, either he didn't go through the entire application or that his one paragraph in the assessment to refer is not a full... Well, we have case law that says that the immigration, the IJs are not supposed to admit these documents into evidence from the asylum officer. That's right. But was that issue raised on appeal to the BIA? The... I believe that the reliability of the assessment to refer was raised to the BIA. But not the admission as such? No, Your Honor. Okay. All right. Thank you. Thank you. The case argued is submitted.
judges: Fogel, Fisher, Paez